UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

──────

EFREM STEPHON WILSON,

                Petitioner,              Case No. 1:14-cv-144

v.                                       Honorable Robert J. Jonker

CARMEN PALMER,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Following a jury trial in the Wayne County Circuit Court, Petitioner Efrem Stephon Wilson was convicted of involuntary manslaughter, MICH. COMP. LAWS § 750.321 and first-degree child abuse, MICH. COMP. LAWS § 750.136b(2).  On April 6, 2011, Petitioner was sentenced as a fourth-offense felony offender, MICH. COMP. LAWS § 769.12, to two concurrent terms of 10 to 15 years in prison. Petitioner is presently serving that sentence with the Michigan Department of Corrections at the Newberry Correctional Facility.  In his *pro se* petition, Petitioner raises two grounds for relief, as follows:

    I.    [Petitioner] was denied the Effective Assistance of Counsel at Trial where counsel failed to challenge the reference to past allegations of domestic violence and child abuse made during a counsel-less non-custodial interview conducted by a Police Officer on the scene of the death of the decedent and allowed the admission of evidence regarding his criminal record and status as a parolee.

    II.   The Insufficient evidence presented on the issue of the timing of the injury that caused the death of the decedent, occasioned by the medical examiner's

failure to conduct sufficient scientific testing during and following the Autopsy, to support a finding of guilty beyond a reasonable doubt of one count each of involuntary manslaughter and first degree child abuse, constitute a denial of the Due Process of Law guaranteed by the Fifth Amendment to the United States Constitution.

(Pet. 4-6, ECF No. 1, PageID.4-6.)  Petitioner has exhausted his state court remedies with respect to each issue.

Petitioner timely filed his petition on February 13, 2014.  On October 1, 2014, Respondent filed an answer to the petition, (ECF No. 10) and the state-court record, pursuant to Rule 5, RULES GOVERNING § 2254 CASES, (ECF No. 11)[1] stating that the grounds should be denied.  Upon review and applying the AEDPA standards, I find that Petitioner's claims are without merit. Accordingly, I recommend that the petition be denied.

## Procedural History

### A.    Trial Court Proceedings

Petitioner was accused of killing M.H., the two-month old infant daughter of Ms. Rhonda Harbin, while babysitting her between March 2, 2010, and March 3, 2010.  An autopsy report revealed that M.H. had died due to multiple blunt-force injuries.  After the medical examiner ruled M.H.'s death a homicide, Petitioner was questioned and subsequently charged in connection with the infant's death.

---

[1] The Rule 5 materials include several transcripts of the trial court proceedings.  The transcripts shall be referenced as follows:

| | |
|---|---|
| March 25, 2010 Preliminary Examination | (Prelim. Examination Tr., ECF No. 11-2, PageID.___) |
| March 14, 2011 Trial Transcript (Volume 1) | (Trial Tr. I, ECF No. 11-18, PageID.___) |
| March 15, 2011 Trial Transcript (Volume 2) | (Trial Tr. II, ECF No. 11-19, PageID.___) |
| March 16, 2011 Trial Transcript (Volume 3) | (Trial Tr. III, ECF No. 11-20, PageID.___) |
| March 17, 2011 Trial Transcript (Volume 4) | (Trial Tr. IV, ECF No. 11-21, PageID.___) |
| March 18, 2011 Trial Transcript (Volume 5) | (Trial Tr. V, ECF No. 11-22, PageID.___) |
| March 21, 2011 Trial Transcript (Volume 6) | (Trial Tr. VI, ECF No. 11-23, PageID.___) |
| April 6, 2011, Sentencing Transcript | (Sentencing Tr. ECF No. 11-24, PageID.___) |

At the March 25, 2010, preliminary examination Dr. Boguslaw Pietak, an assistant medical examiner for the Wayne County Medical Examiner's Office, testified that he had performed an autopsy of M.H. on March 4, 2010, approximately twenty-four hours after the infant's death. (Prelim. Examination Tr. 16-17, ECF No. 11-2, PageID.223-224.)  The doctor testified that based upon his examination of M.H., she appeared to have been a child of normal weight and development. Dr. Pietak summarized his autopsy report by testifying that an external examination demonstrated blood coming from M.H.'s nose.  (Prelim. Examination Tr. 16-17, ECF No. 11-2, PageID.223-224.) Dr. Pietak further testified that his internal evaluation of the infant revealed several injuries, including a focal hemorrhage above the infant's left ear, a left subdural hemorrhage underneath the dural of the brain, a hemorrhage on the subarachnoid surface of the bottom portion of the brain, and evidence of optic nerve sheath hemorrhage.  (Prelim. Examination Tr. 22-24, ECF No. 11-2, PageID.229-231.)  He further noted a fracture on M.H.'s right first rib, and hemorrhages in between the ribs from the infant's first rib to the fourth.  There was also a hemorrhage to the right upper lobe of the lung, as well as a hemorrhage to the right lobe of the thymus.  (Prelim. Examination Tr. 25, ECF No. 11-2, PageID.232.)  Dr. Pietak concluded that, based on his experience, M.H. died due to multiple blunt force injuries.  The manner of her death was homicide.  (Prelim. Examination Tr. 26, ECF No. 11-2, PageID.233.)

The infant's mother, Rhonda, also testified.  She stated M.H. was born on December 21, 2009.  Petitioner had been her boyfriend for the last seven years, but he was not the father of M.H.  (Prelim. Examination Tr. 49-50, ECF No. 11-2, PageID.256-257.) On March 2, 2010, Rhonda was with M.H. at Petitioner's apartment, located on West Grand Boulevard in the city of Detroit. Though she testified she did not live at the apartment, Rhonda recollected that she had been at

Petitioner's apartment for a week or two.  (Prelim. Examination Tr. 52, ECF No. 11-2, PageID.259.)  At 3:00 PM on March 2nd, she left Petitioner's apartment in order to help her parents move.  She left M.H. in Petitioner's care at his apartment.  (Prelim. Examination Tr. 53-54, ECF No. 11-2, PageID.260-261.)  She testified that Petitioner would often watch her baby, and had previously watched over another child of hers.  (Prelim. Examination Tr. 51, ECF No. 11-2, PageID.258.)  Before she left, she had fed and burped M.H.  Rhonda further testified that when she left Petitioner's apartment, M.H was uninjured and had not previously been ill.  (Prelim. Examination Tr. 53, ECF No. 11-2, PageID.260.)

Rhonda next spoke with Petitioner at 9:00 p.m. that evening.  She had been pulled over by the police for drinking and driving and wanted to check in with Petitioner.  (Prelim. Examination Tr. 54-55, ECF No. 11-2, PageID.261-262.)   Petitioner told Rhonda that M.H. was fine, and Rhonda told Petitioner that if she did not call him back, then he should assume she had been taken to jail.  (Prelim. Examination Tr. 56, ECF No. 11-2, PageID.263.)  The next morning, at around 5:00 a.m., she twice tried to call Petitioner to tell him that her bond was set at $100.00.  When she was unable to reach him she called her sister, Mary Harbin, and asked her to contact Petitioner on her behalf.  (Prelim. Examination Tr. 58-59, ECF No. 11-2, PageID.265-266.)  At 8:00 a.m., however, she was discharged and taken by police to Petitioner's apartment.  When she arrived at the apartment, she was told M.H. was dead.  (Prelim. Examination Tr. 59-60, ECF No. 11-2, PageID.266-267.)  She met with Petitioner at his apartment, and testified that he appeared normal.  When she asked him what had happened, Petitioner responded that he did not know.  (Prelim. Examination Tr. 60-61, ECF No. 11-2, PageID.267-268.)  He said only that when he had woken up,

he saw something dry on the infant's pacifier.  (*Id.*)  Rhonda used the restroom, and observed Petitioner's phone on the windowsill.  (*Id.*)

The prosecution next called Sergeant Samuel Mackie, a Detroit police officer assigned to the homicide unit.  He was the officer in charge of the investigation into M.H.'s death and was assigned to the case after the medical examiner ruled the infant's death a homicide.  (Prelim. Examination Tr. 72-73, ECF No. 11-2, PageID.279-280.)  Sergeant Mackie testified that on the afternoon of March 4, 2010, he went to Petitioner's apartment and asked to interview him along with Rhonda, and Petitioner's adolescent son.  Petitioner told Sergeant Mackie that he would consent to questioning, but that his son was not there and Petitioner had no way of contacting him.  Sergeant Mackie then drove Petitioner to the homicide department, and the two waited for Rhonda to join them.  Sergeant Mackie testified that Petitioner was not in custody at that time.  (Prelim. Examination Tr. 77, ECF No. 11-2, PageID.284.)  When Rhonda arrived, they were taken into an interview room that was equipped with recording devices.  Before beginning the interview both Petitioner and Rhonda were informed of their constitutional rights, and the two initialed and signed a certificate acknowledging that they had been informed of their rights.  (Prelim. Examination Tr. 80-81, ECF No. 11-2, PageID.287-288.)  Soon after the interview started, Rhonda was taken out of the room, and the sergeant began his questioning of Petitioner by discussing a time line of the last few days.  (*Id.*)  Petitioner told Sergeant Mackie that after Rhonda left on March 2nd, he was the sole caretaker of M.H.  While his son was also present, Petitioner stated that his son never had access to M.H. and did not hold the infant during that time.  (Prelim. Examination Tr. 84-85, ECF No. 11-2, PageID.291-292.)

- 5 -

Continuing with the questioning, Sergeant Mackie brought up the medical examiner's autopsy report.  He listed the fractures and hemorrhages that the medical examiner had identified. The sergeant testified that initially Petitioner responded by stating he must have cradled M.H. too hard, but after further discussion, Petitioner admitted he shook the infant because she was crying. (Prelim. Examination Tr. 86-87, ECF No. 11-2, PageID.293-294.)  Petitioner then demonstrated, using a doll, how he shook M.H.  (Prelim. Examination Tr. 89-90, ECF No. 11-2, PageID.296-297.)

After speaking with Petitioner, Sergeant  Mackie wrote down a statement from Petitioner in response to the sergeant's questions.  In response to a question about what happened to M.H., Sergeant Mackie wrote that Petitioner said "I was watching her.  She started crying, I tried to calm her down.  I picked her up, I shook her.  I moved her from side to side and back to front.  I laid her down and put her to bed.  Gave her her pacifier, put the cover on her, we went to sleep.  Got up the next morning, noticed that [M.H.] wasn't breathing, called the EMS."  (Prelim. Examination Tr. 93, ECF No. 11-2, PageID.300.)  Sergeant Mackie further wrote that Petitioner said he had shaken her around 1:15 a.m., the morning of March 3rd and that he had shaken M.H. for two or three minutes.  He held the infant "in both hands with his hands around her ribs and the belt facing him." (Prelim. Examination Tr. 94, ECF No. 11-2, PageID.301.)  While he didn't think he shook M.H. that hard, he admitted he "probably" shook her "kind of hard, if it caused those injuries."  (*Id.*) Thereafter, Petitioner stated he placed M.H. face down on the bed, and that at 2:00 a.m., they both fell asleep.  The next morning, about 7:20 a.m., was when he first thought there was something wrong.  (*Id.*)  After asking Petitioner whether there was anything else he wanted to say, Sergeant Mackie stated Petitioner inquired about an attorney and the sergeant ended the interview, and did not

ask Petitioner to sign the statement.  (Prelim. Examination Tr. 95, ECF No. 11-2, PageID.302.) Petitioner was subsequently taken into custody and charged in connection with M.H.'s death.

After hearing testimony from the three witnesses, the district court found probable cause and bound Petitioner over for trial.

Jury selection for the trial began on March 14, 2011, and concluded on March 15, 2011.  The prosecution began their case in chief by calling Rhonda Harbin.  Rhonda's testimony to the jury mirrors much of what she had testified to during the preliminary examination: On March 2, 2010, she had been dating Petitioner for seven years.  She had several children, but Petitioner was not the father of any of them.  (Trial Tr. II 36, ECF No. 11-19, PageID.982.) She left at 3:00 p.m. that afternoon to help some relatives move, and left her infant daughter, M.H., in the care of Petitioner as she had done on several prior occasions.  M.H. was two months old, and was not able to crawl, scoot, or roll over. (Trial Tr. II 39, 42-43 ECF No. 11-19, PageID.985, 988-989.)  Up to that point, M.H. was in good health.  There had been no complications with her birth, and she had not been ill or sustained any injuries.  (Trial Tr. II 38, ECF No. 11-19, PageID.984.)  Rhonda testified she had called Petitioner around 9:00 p.m. that evening after being pulled over, and was told by Petitioner that her daughter was doing fine.  Rhonda was subsequently taken into custody on a drunk driving charge.  The next morning, after being informed of her bond, she tried to call Petitioner but was unable to reach him.  She called her sister, but before either her sister or Petitioner posted her bond, she was released around 8:00 a.m.  (Trial Tr. II 46, ECF No. 11-19, PageID.992.) She was taken by police to Petitioner's apartment, and she saw several police officers there.  She was then told M.H. was deceased, but was not allowed to see the body.  She saw Petitioner's phone on the windowsill in the bathroom.  (Trial Tr. II 49-50, ECF No. 11-19, PageID.995-996.)

The prosecution next called Officer Kenneth McKay, a paramedic employed by the Detroit fire department.  Officer McKay testified he was called to Petitioner's apartment at 7:29 a.m. the morning of March 3, 2010.  When he arrived, Petitioner took the officer and his partner up to the apartment.  (Trial Tr. II 71, ECF No. 11-19, PageID.1017.)  Officer McKay testified he found an infant wearing a pink and white outfit on a bed and lying on its stomach.  When he touched the infant, it was cold and had rigor in all the extremities. The child was stiff with no vitals, blood pressure, or pulse.  (Trial Tr. II 72-73, ECF No. 11-19, PageID.1018-1019.)  The officer rolled the infant over and again noticed it was stiff and cold.  There was also a blood tinged fluid coming from the nasal cavity.  He testified that Petitioner was disconnected, withdrawn, and emotionless.  (Trial Tr. II 73-74, ECF No. 11-19, PageID.1019-1020.)  The officer testified he had a "gut feeling" something was wrong.  (Trial Tr. II 81, ECF No. 11-19, PageID.1027.)

Next, the prosecution called Officer Peter Keyes of the Detroit Police Department. He testified that he received a report of a possible infant death on the morning of March 3, 2010. He was instructed to go to Petitioner's apartment, and when he arrived he made contact with Petitioner.  EMS was already on the scene.  (Trial Tr. II 84-85, ECF No. 11-19, PageID.1030-1031.) He observed a small infant child in a one-piece pajama outfit with blood coming from the nose and mouth area.  (*Id.*)  He asked Petitioner what happened, to which Petitioner responded that he had laid down next to the child at around 1:00 a.m., and that at around 7:20 a.m. the baby was not breathing. He went to a neighbor's apartment to call 911.  (Trial Tr. II 86, ECF No. 11-19, PageID.1032.)

The jury also heard testimony from Officer Lori Briggs who was a Detroit police officer assigned to the Evidence Technician Unit.  She testified that she was responsible for collecting evidence.  (Trial Tr. II 95, ECF No. 11-19, PageID.1041.)  She too was called to

Petitioner's apartment on the morning of March 3, 2010.  While there, she took photographs, collected two pink blankets, and did a "scene sketch" of the inside of the apartment.  (Trial Tr. II 95-96, ECF No. 11-19, PageID.1041-1042.)  She noted that the photographs showed suspected blood on the blankets and on a pacifier.  (Trial Tr. II 100, ECF No. 11-19, PageID.1046.)

After Officer Briggs, the prosecution called Officer Derrick Maye, a Detroit police officer assigned to the homicide unit.  Officer Maye responded to Petitioner's apartment on March 3, 2010, after receiving notification of a baby's death.  (Trial Tr. II 110, ECF No. 11-19, PageID.1056.)  Officer Maye interviewed Petitioner at his home from 9:17 to 10:15 a.m.  (Trial Tr. II 118, ECF No. 11-19, PageID.1064.)  After posing some questions to Petitioner, Officer Maye wrote a three-page statement containing Petitioner's responses to the officer's questions.  The statement was signed by Petitioner on each page.  (Trial Tr. II 112, ECF No. 11-19, PageID.1058.)  Officer Maye read the statement into the record for the jury, as follows:

> Question:    What can you tell me about the death of [M.H.]?
>
> Answer:    Around one A.M. this morning, I fed the baby a sixteen ounce bottle of milk.  I played with her for a while.  I laid her down on the bed and patted her until she went to sleep which was around two A.M.  I laid down next to her and went to sleep.
>
> I was awoke by a cell phone ringing.  It was Ronda's [sic] sister calling to tell me Ronda [sic] was in jail at the 11th Precinct.  I got out of bed to make sure my son was getting ready for school.  Then I checked the baby and noticed that there was blood around her pacifier.
>
> I took the pacifier out of her mouth and turned her over.  I put my hand up to the baby's face and noticed she wasn't breathing and I called 911. I waited until 911 showed up.
>
> Question.    How often did you babysit [M.H.]?

Answer:      I babysitted regularly, since she's been born.  I had for weeks straight at times.

Question:      Does the baby or baby's mother live with you?

Answer:      No. I just would babysit sometimes.  Both the baby and my mother would spend – both the baby and the mother would spend the night.

Question:      Did the baby have medical problems?

Answer:      I [don't] think so.  I didn't give her any medicine.  She would have nightmares . . . She would just be crying.

Question:      Did the baby cry last night before you put her to sleep?

Answer:      Yes, she cries all the time.

Question:      Did the baby's crying frustrate you last night?

Answer:      No.

Question:      Has the baby's crying ever frustrated you?

Answer:      No.

Question:      How long have you been seeing the baby's mother?

Answer:      For about six to seven years.

Question:      Are you the father of [M.H.]?

Answer:      No.

Question:      Did the baby's mother cheat on you?

Answer:      Yes.

Question:      How did that make you feel?

Answer:      We were just having sex.  We weren't really together.  We had an understanding.

. . .

- 10 -

Question:     Is there a history of domestic violence between you and the baby's mother?

Answer:      She has called the police on me before when she used to stay on Clemons Stsreet, but I was never arrested.   I was arrested for domestic violence before, but that was with my other baby's mother. That was back in 1989.

Question.    What is that baby's mother's name?

Answer:      Wilma Rounds.  She lives somewhere across Eight Mile.

Question:    Why were you arrested?

Answer:      We were fighting.

Question:    Did you ever hit [M.H] because she was crying?

Answer:      No.

Question:    Did anyone else hit the baby?

Answer:      No.

Question:    Who else was in your apartment with you when this happened?

Answer:      Just me and my son, but he was asleep – but he was sleep.

Question:    What's your son's name?

Answer:      [K.W.]

Question:    Was there anyone else in the bed with you and the baby?

Answer:      No, just me.

. . .

Question:    Have you ever been investigated by Child Protective Services?

Answer:      Yes.  Someone called and told them my son [K.W.] wasn't being properly cared for and someone came to my house from Social Services.  That was about twelve years ago.

                They came and checked my house and the lady said she was going to close my case because there was nothing wrong.  I never heard from them again.

Question:     Why did Ronda [sic] Harbin, the baby's mother, call the police on you in the past?

Answer:      She wanted me to leave because she wanted another guy to come over.

Question:     Did you ever hit her?

Answer:      No.  If anything, she hit me.

Question:     Did the baby have any problems in the past when you watched her – or him?

Answer:      No.

Question:     Has Ronda [sic] ever been investigated by Social Services?

Answer:      Yes.  At least twice.

Question:     Did they investigate – why did they investigate her?

Answer:      It was because another baby she had when she was – when she was at the hospital for [M.H.], [M.H.] had to stay at the hospital for a week before they let Ronda [sic] take her home.  I don't know why they investigated her.

Question:     Do you know the name of Ronda's [sic] other children?

Answer:      [S.H.], [L.H.], [S.H.] She has two – two more, but they stay with their father.

(Trial Tr. II 113-117, ECF No. 11-19, PageID.1059-1063.)

Next, the prosecution called Ms. Belinda Miggins.  Ms. Miggins was the 911 operator who took Petitioner's call the morning of March 3, 2010.  (Trial Tr. II 124-125, ECF No. 11-19, PageID.1070-1071.)  During her testimony, the prosecution played the 911 call made by Petitioner. (*Id.*)

At the end of the second day of trial, the prosecution called Sergeant Mackie.  As with Rhonda Harbin's testimony, Sergeant Mackie's testimony fell in line with his testimony at the preliminary hearing.  His testimony ended with the prosecution playing a video record of the March 4, 2010, interview for the jury.

On day three of the trial, the prosecution called Dr. Carl Schmidt, a forensic pathologist employed as a medical examiner in Wayne County.  Dr. Pietak had resigned from the medical examiner's office after the preliminary hearing, and Dr. Schmidt testified regarding Dr. Pietak's autopsy report.  He further testified that a baby's brain is more susceptible to injury from being shaken than an adult because a baby's brain lacks the structural integrity of an adult brain. (Trial Tr. III 18, ECF No. 11-20, PageID.1122.)  He also stated it was possible to have a significant blunt impact to the head without evidence of injury.  (Trial Tr. III 19, ECF No. 11-20, PageID.1123.) He noted that the damage to the infant's head could be caused by being hit by a surface that is not hard, such as a pillow.  (Trial Tr. III 27, ECF No. 11-20, PageID.1131.)

The jury also heard testimony from Deputy Darryl White from the Wayne County Sheriff's Department.  He testified that he was assigned to the division two jail, and that on the afternoon of March 13, 2011, the day before trial in this case began, he was approached by Darius Morris, an inmate at the jail.  (Trial Tr. III 116-117, ECF No. 11-20, PageID.1221-1222.)  Deputy White testified that he spoke with inmate Morris and signed a statement that was written by inmate

Morris.  Deputy White also prepared a report that was given to his supervisor.  (Trial Tr. III 118-119,

ECF No. 11-20, PageID.1222-1223.)

On day four of the trial, the jury heard testimony from Darius Morris.  (Trial Tr. IV

59, ECF No. 11-21, PageID.1297.)  Inmate Morris testified that he knew Petitioner from the Wayne

County Jail.   (Trial Tr. IV 60, ECF No. 11-21, PageID.1298.)  He testified that while imprisoned,

the two began talking about their respective cases.  He testified that Petitioner told him he had been

in a relationship with a woman who had a two-month old daughter.   (Trial Tr. IV 62-63, ECF No.

11-21, PageID.1300-1301.)  He was left to care for the infant when her mother "took off" as she had

on several other occasions.  Petitioner stated he was upset about this.  He did not want to babysit the

infant, but that the baby was left with him and he had no other option.   (Trial Tr. IV 63, ECF No.

11-21, PageID.1301.)  Inmate Morris then stated Petitioner told him that M.H. woke up and started

to cry.  At first he tried to calm the baby by giving her a pacifier, but the baby was still crying.

Petitioner grew frustrated, and began shaking the baby.  (*Id.*)  Petitioner admitted the shaking was

"kind of rough" but that the baby continued to cry.  Finally, Petitioner "slammed" the infant to the

bed.  (Trial Tr. IV 64, ECF No. 11-21, PageID.1302.)  Inmate Morris testified that he initially was

not going to say anything, but then Petitioner stated he was going to "pin" the death on his ten year

old son, and claim that his son dropped the infant while he was playing with her.   (Trial Tr. IV 64-

67, ECF No. 11-21, PageID.1302-1305.)  Disagreeing with this decision, inmate Morris decided to

speak to a prison official about what he had heard.

The prosecution then rested, and the jury next heard the defense's presentation.

Petitioner's counsel called Officer Marcus Lucian Hall, a Wayne County Sheriff's Deputy.  (Trial

Tr. IV 144, ECF No. 11-21, PageID.1382.)  He worked floor security at the Wayne County Jail

division two.  (*Id.*)  He stated that he had observed inmate Morris talk to other inmates about their cases, review their files, and give advice.    (Trial Tr. IV 145-146, ECF No. 11-21, PageID.1383-1384.)  Officer Hall stated, however, that he had never seen or heard of inmate Morris speaking with Petitioner.  (*Id.*)  The defense also called Mr. Derrick Johnson, Petitioner's older brother.  (Trial Tr. IV 147, ECF No. 11-21, PageID.1385.)  Mr. Johnson testified that Petitioner had been in special education classes from kindergarten to highschool.  He testified that things would often have to be repeated to Petitioner before Petitioner was able to understand them.    (Trial Tr. IV 148, ECF No. 11-21, PageID.1386.)    He testified that it was normal for Petitioner not to get excited about something.  Petitioner would not get upset, even when something tragic happened.    (Trial Tr. IV 149, ECF No. 11-21, PageID.1387.)

Petitioner's counsel asked Mr. Johnson about a recorded phone call that was made when Petitioner called him from jail.  The tape had previously been submitted to the jury and seemed to support Mr. Morris' statement that Petitioner was going to shift the blame on his son.  Mr. Johnson denied telling Petitioner to shift the blame to his son at trial, but rather stated that he told Petitioner that when he spoke to other inmates, he should shift blame for his own protection, as other inmates don't react well to baby killers.    (Trial Tr. IV 152, ECF No. 11-21, PageID.1390.)  The defense next called Ms. Bettie Harrison, Petitioner's mother.  (Trial Tr. IV 156, ECF No. 11-21, PageID.1394.)  She also testified that Petitioner took special education classes while in school and that he required things to be repeated to him.   He had a calm demeanor, even when something bad would happen. (Trial Tr. IV 157-159, ECF No. 11-21, PageID.1395-1397.)

The jury also heard testimony from Dr. Ljubisa Dragovic, a forensic pathologist and chief medical examiner for Oakland County.   (Trial Tr. IV 10, ECF No. 11-21, PageID.1248.)  Dr.

- 15 -

Dragovic testified he had reviewed the Wayne County Medical Examiner's file in the matter, including the report, photographs, autopsy photographs, and other slides. ( Trial Tr. IV 13, ECF No. 11-21, PageID.1251.) Defense counsel questioned Dr. Dragovic about the methods of determining a time of death. Dr. Dragovic responded that there are physical characteristics that can be taken into account as well as tissue samples that can indicate whether an injury was sustained immediately prior to death. (Trial Tr. IV 1516, ECF No. 11-21, PageID.1253-1254.) Dr. Dragovic testified that though there were tissue samples from the chest and belly, there did not appear to be microscopic slides from the injuries sustained in the brain. (Trial Tr. IV 16, ECF No. 11-21, PageID.1254.) The doctor further testified that the samples he received were not included in the examiner's report, contrary to state law. (Trial Tr. IV 17, ECF No. 11-21, PageID.1255.) Defense counsel asked whether, had slides been taken from M.H.'s brain, those slides would have helped in assessing the time of M.H.'s death. Dr. Dragovic responded that such slides "can in general terms" help in providing the range in the time of death in so much as they assist in determining the age of an injury. (Trial Tr. IV 19, ECF No. 11-21, PageID.1257.) Based on the available evidence, Dr. Dragovic testified that M.H. could have sustained the injuries thirty-six to forty-eight hours prior to the autopsy conducted on March 4, 2010. (Trial Tr. IV 25, ECF No. 11-21, PageID.1263.)

The following day, March 18, 2011, the jury was given a verdict form in which they could find Petitioner not guilty, guilty of first degree felony murder, guilty of second degree murder, or guilty of involuntary manslaughter at to Counts I and II. As to Count III, the jury was instructed they could find Petitioner not guilty or guilty of child abuse in the first degree. (Trial Tr. V 9-10, ECF No. 11-22, PageID.1422-1423.) Jury deliberations carried over the weekend to Monday, March 21, 2011. On that day, the jury found Petitioner guilty of involuntary manslaughter and child abuse

- 16 -

in the first degree.  (Trial Tr. VI 5, ECF No. 11-23, PageID.1501.)  At the sentencing hearing, held

on April 6, 2011, the trial court sentenced Petitioner to two concurrent terms of ten to fifteen years

in prison. (Sentencing Tr. 45-46, ECF No. 11-24, PageID.1551-1552.)

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which

was filed by counsel on December 28, 2011, raised the same two issues as raised in this application

for habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal, ECF No. 11-25.)  By unpublished

opinion issued on June 26, 2012, the Michigan Court of Appeals rejected all appellate arguments and

affirmed Petitioner's convictions and sentences.  (*See* 6/26/12 Mich. Ct. App. Opinion (MCOA Op.),

ECF No. 11-25, PageID.1555-1560.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme

Court.  Petitioner raised the same two claims raised before and rejected by the Michigan Court of

Appeals.  By order entered November 20, 2012, the Michigan Supreme Court denied his application

for leave to appeal because it was not persuaded that the questions presented should be reviewed.

(See 11/20/12 Mich. Ord., ECF No. 23-1, PageID.1792.)  Petitioner did not seek collateral review,

but instead filed the instant application.

### Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996,

PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The

AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect

to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has

"drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir.

2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

        The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655.  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 132 S. Ct. 38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

        A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable

- 18 -

facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.  *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference).  The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096.  Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### A.    Ineffective Assistance of Trial Counsel Claim.

In his first ground for habeas relief, Petitioner claims ineffective assistance of trial counsel based on his attorney's failure to object to the admission of the statement he made to Officer Maye which included references to his past experiences with Child Protective Services as well as an admission of a prior domestic violence arrest.  Petitioner also faults his attorney when the video tape of his questioning with Sergeant Mackie was played for the jury.  Petitioner notes that although the parties had agreed that references to his status as a parolee were to be muted for the jury, certain references were in fact not muted.  (Pet. Br. 7-13, ECF No. 2, PageID. 97-103.)

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.

A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

Moreover, as the Supreme Court recently has observed, while "'[s]urmounting *Strickland*'s high bar is never an easy task,' . . . [e]stablishing that a state court's application was unreasonable under § 2254(d) is all the more difficult." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 1485 (2010)).  Because the standards under both *Strickland* and § 2254(d) are highly deferential, "when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).  In those circumstances, "[t]he question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

The decision whether to object "in a particular instance is made in the strategic context of the entire trial, [and] any single failure to object does not constitute error unless the information introduced 'is so prejudicial to a client that failure to object essentially defaults the case to the state.'" *Hodge v. Haeberlin*, 579 F.3d 627, 649 (6th Cir. 2009) (quoting *Lundgren v. Mitchell*,

440 F.3d 754, 774 (6th Cir. 2006).  "[T]he Constitution does not insure that defense counsel will

recognize and raise every conceivable constitutional claim."  *Engle v. Isaac*, 456 U.S. 107, 134

(1982). "As a general matter, it is not easy to prevail on claims of ineffective assistance based on

failures to object at trial because 'the defendant must overcome the presumption that . . . the

challenged action might be considered sound trial strategy.'" *Britt v. Howes*, 404 F. App'x 954, 957

(6th Cir. 2010).  Indeed, "experienced trial counsel learn that objections to each potentially

objectionable event could actually act to their party's detriment," which is why counsel use

objections in a strategic manner.  *Lundgren*, 440 F.3d at 774.  Ultimately, an attorney "must so

consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's

failure cannot reasonably have been said to have been part of a trial strategy or tactical choice." *Id.*

at 774-75.

The Michigan Court of Appeals reviewed this claim on Petitioner's direct appeal,

applied the *Strickland* standard, and denied the claim for lack of merit:

> "Whether a defendant received ineffective assistance of trial counsel presents a mixed question of fact and constitutional law." *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011), citing *People v Grant*, 470 Mich 477, 484; 684 NW2d 686 (2004).  "The trial court must first find the facts and then decide whether those facts constitute a violation of the defendant's constitutional right to effective assistance of counsel. The trial court's factual findings are reviewed for clear error, while its constitutional determinations are reviewed de novo." *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004), citing *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). Where claims of ineffective assistance of counsel have not been preserved, this Court's review is limited to errors apparent on the record. *People v Lockett*, 295 Mich App 165, 186; ___ NW2d ___ (2012).
>
> Determining whether a defendant's trial counsel was ineffective requires conducting a two-stage inquiry.  First, "the defendant must show that counsel's performance fell below an objective standard of reasonableness." *Armstrong*, 490 Mich at 290, citing *Strickland v Washington*, 466 US 668, 687-688; 104 S Ct 2052; 80 L Ed 2d 674 (1984).  "In doing so, the defendant must overcome the strong presumption that

counsel's assistance constituted sound trial strategy." *Armstrong*, 490 Mich at 290, citing *People v Rice (On Remand)*, 235 Mich App 429, 444; 597 NW2d 843 (1999). Second, "the defendant must show that, but for counsel's deficient performance, a different result would have been reasonably probable." *Armstrong*, 490 Mich at 290, citing *Strickland*, 466 US at 694-696.

It was objectively reasonable for defendant's counsel to not object to statements defendant gave to Officer Maye regarding his past involvement with CPS. Defendant told Officer Maye that, when it was alleged that he had abused his son, an investigator from CPS "came and checked my house and the lady said she was going to close my case because there was nothing wrong. I never heard from them again." In other words, defendant's statements to Officer Maye were that he was exonerated by CPS. Accordingly, the jury, by inference, could readily have concluded that CPS determined that defendant was a competent father, and it was objectively reasonable trial strategy for trial counsel to allow this testimony's elicitation.

It was also reasonable for defendant's counsel not to object to defendant's past arrest for domestic violence. Pursuant to MRE 404(b)(1) and case law interpreting it, evidence of a defendant's prior bad acts is admissible if "(1) the evidence [is] offered for a proper purpose; (2) the evidence [is] relevant; and (3) the probative value of the evidence [is] not [] substantially outweighed by unfair prejudice [under MRE 403]." *People v Kahley*, 277 Mich App 182, 184-185; 744 NW2d 194 (2007). Regarding whether evidence of a defendant's prior bad acts is offered for a proper purpose, the Supreme Court recently explained that "evidence is *inadmissible* under [Rule 404(b)(1)] *only* if it is relevant *solely* to the defendant's character or criminal propensity." *People v Mardlin*, 487 Mich 609, 615-616; 790 NW2d 607 (2010) (emphasis in original). Here, the jury heard that defendant was arrested in 1989 for domestic violence, and that Ronda Hardin, [M.H.'s] mother, had called the police alleging that defendant abused her, in a case where he was charged with abusing and killing his child. MRE 404(b)(1) explains that evidence of defendant's prior bad acts may be admissible for a purpose other than criminal propensity, including "proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident." The prosecution does not argue on appeal that this evidence is relevant to any admissible basis under MRE 404(b), nor did it do so below, and we can conceive of no basis other than defendant's propensity for violence of which this evidence is probative. Accordingly, this evidence was not admitted for a proper purpose.

However, this evidence was not substantially more prejudicial than probative under MRE 403. "Unfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008) (internal citations omitted). There was overwhelming evidence of defendant's

guilt, which will be discussed in greater detail below.  Defendant's prior domestic violence arrest was remote in time (1989), and references in the statement to the arrest itself were brief and fleeting.  It is therefore likely that defense counsel reasoned that it would have been highly improbable that the jury would convict him on the basis of his prior domestic violence arrest.  Accordingly, because this evidence was not substantially more prejudicial than probative, it was objectively reasonable for defendant's counsel not to object to its admission.

Defendant's counsel's actions regarding the videotaped interview with Sergeant Mackie were also reasonable.  Defendant argues that it was defendant's counsel's fault that the videotape was not muted properly to omit defendant's references to his status as a parolee for the crime of receiving and concealing a stolen motor vehicle.  However, the trial judge explicitly stated on the record that "I don't blame anyone.  I think we talked about before the difficulty of making sure that we shut off the video at the correct time of viewing it as I know from my own experience having done that before in a trial."  Defendant's counsel did not object while the tape was played because he feared that doing so would draw more attention to defendant's admission that he was on parole.  Indeed, not objecting in front of the jury was a reasonable decision, as the references to defendant's parolee status were, according to the trial judge, "fleeting," and objecting to their inadvertent admission in front of the jury while the tape was playing may well have influenced the jury to give the references more weight than they were due.  However, defendant's counsel did object outside the hearing of the jury, and moved for a mistrial.  Although the judge denied the mistrial, he offered to give a curative instruction, and defendant's counsel agreed.  Specifically, the judge told the jury:

> You must not consider the fact that he was on parole for receiving and concealing a stolen motor vehicle for any purpose.  For example, you may not decide that that fact shows that he's a bad person or that he is likely to commit crimes.  You must not convict him here because you think he is guilty of other bad conduct all right.  All the evidence must convince you beyond a reasonable doubt that the Defendant committed the alleged crimes for which he's on trial for or you must find him not guilty.

"[J]urors are presumed to follow their instructions," absent evidence to the contrary.  *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008).  There is no evidence that the jury did not follow the curative instruction.  Indeed, the curative instruction contextualized the admission that defendant was a parolee in a way that defendant's counsel objecting during the playing of the tape would not.  Specifically, the curative instruction indicated that the crime for which defendant was on parole was not a violent crime, decreasing the likelihood that the jury would interpret defendant's admission as probative on propensity for violence.  Accordingly, the

- 24 -

instruction was sufficient to cure any potential prejudice to the jury caused by the accidental admission of defendant's status as a parolee, and defendant's counsel's actions in agreeing to the instruction were objectively reasonable.

Moreover, even assuming, arguendo, that it was error for the jury to hear and consider the evidence on which defendant relies in advancing his ineffective assistance of counsel claim, reversal would not be required in this case, because the outcome at trial would not have been different even if evidence was suppressed. This Court has held that where the evidence of guilt of the charged offense is otherwise overwhelming, the admission of prior bad acts evidence, even improperly admitted prior bad acts evidence, amounts to harmless error. *People v Davenport (After Remand)*, 286 Mich App 191, 199; 779 NW2d 257 (2009); *People v Coleman*, 210 Mich App 1, 7; 532 NW2d 885 (1995).

When Harbin left [M.H.] alone with defendant, she was alive and healthy. By defendant's own admission, only he and his teenage son were in the apartment with [M.H.] that night, but defendant's son was asleep. Defendant initially denied shaking [M.H.], although he later changed his story and admitted to shaking her, gripping her around the ribs, for "about two or three minutes . . . . It might have been a bit longer." Defendant's own description regarding how he shook [M.H.] corresponded with the testimony of Dr. Schmidt, the Wayne County Medical Examiner, regarding injuries [M.H.] sustained to her chest. Specifically, Dr. Schmidt testified that [M/H.] suffered a broken rib, a bruised right lung, and hemorrhaging around the site of the bruised lung and a fractured rib. Dr. Schmidt explained that "to actually suffer an injury like that to the lung means that significant energy had to be submitted across the chest wall for a bruise of that magnitude to appear in the lung." While incarcerated and awaiting trial, defendant admitted to Darius Morris, a fellow inmate who testified at trial in exchange for a reduction in his sentence, that defendant had 'slammed' [M.H.] onto the bed after he shook her. This was consistent with Dr. Schmidt's explanation of how [M.H.] suffered brain swelling and hemorrhaging to her optic nerve and skull. Dr. Schmidt testified that sometimes injuries such as the ones to [M.H.]'s head and brain can occur when a child is

> flung against a surface that is not hard. . . . a pillow for example, and as the infant's head strikes a surface such as a pillow that surface molds itself around the infant's head and distributes the impact throughout the surface area of the infant's head so that there is no discreet evidence of impact.

In short, even without the evidence defendant argues was improperly admitted, there was overwhelming evidence of defendant's guilt. Accordingly, the outcome of the trial would not have been different were that evidence suppressed, and therefore, defendant's counsel was not ineffective.

(6/26/12 MCOA Op. 2-4, ECF No. 11-25, PageID.1556-1558.)  The Court finds that Petitioner has not shown that the decision of the Michigan Court of Appeals rejecting his claims of ineffective assistance of trial counsel was "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" under the "doubly deferential" standard of review.  28 U.S.C. § 2254(d)(1).  Petitioner's trial counsel did not perform deficiently by choosing not to object to the admission of his statement to Officer Maye.  This is because, as the Michigan Court of Appeals found, deciding whether and when to object "might be considered sound trial strategy," which does not constitute ineffective assistance of counsel. *Strickland*, 466 U.S. at 589 (citation omitted); *see, e.g.*, *Butler v. Hosking*, 47 F.3d 1167, *9 (6th Cir. 1995) (noting counsel's failure to object could be considered trial strategy because he "may have wanted to avoid highlighting those comments [during closing arguments] to the jury and thus focusing the juror's attention upon damaging subject matter.").  For the same reason, Petitioners claim regarding the inadvertent admission of certain statements regarding his parolee status cannot constitute ineffective assistance.  His counsel stated that he did not want to draw attention to the inadvertent admission of the statement and subsequently asked for a mistrial.  Though the request was denied, the trial court gave a cautionary instruction to the jury.  This is exactly the type of action contemplated in the above authority that has found no deficient performance. Therefore, the undersigned recommends that this claim be denied, as Petitioner has failed to demonstrate that his counsel performed deficiently.  *See Strickland*, 466 U.S. at 697 (noting that when a petitioner fails to make a sufficient showing regarding one of two *Strickland* prongs, the courts need not address the other prong).

- 26 -

### B.    Sufficiency of the Evidence Claim.

In his second claim for habeas relief, Petitioner contends that there was insufficient evidence submitted to the jury to find him guilty of involuntary manslaughter and first degree child abuse.  The Court disagrees.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*  Issues of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993).  Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Jackson*, 443 U.S. at 319.  Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case:  First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'"  *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011)

(en banc) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)).  This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds.  *Id*. at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

The Michigan Court of Appeals applied the following standard to Petitioner's challenge:

> This Court reviews the record de novo when reviewing a claim of insufficient evidence.  *People v. Meissner*, 294 Mich App 438, 452; ___ NW2d ___ (2011); *People v. Parker*, 28 Mich App 500, 504; 795 NW2d 596 (2010).  This Court reviews the evidence in the light most favorable to the prosecutor and determines whether a rational trier of fact could find that the essential elements of the crime were proven beyond a reasonable doubt.  *People v. Ericksen*, 288 Mich App 192, 196; 793 NW2d 120 (2010).

(6/26/12 MCOA Op. 5, ECF No. 11-25, PageID.1559.)  The Court of Appeals cited *People v. Ericksen*, 288 Mich App 192, 196; 793 NW2d 120 (2010), for the sufficiency standard.  The *Ericksen* court, in turn, relied on *People v. Nowack*, 462 Mich. 392, 400, 614 N.W.2d 78 (2000); *Nowack* cites *Jackson* as the source of the standard.  Thus, it cannot be said that the standard applied by the Michigan Court of Appeals was contrary to clearly established federal law.

The Michigan Court of Appeals applied the standard as follows:

> A killing done without malice is manslaughter.  *People v Mendoza*, 468 Mich 527, 534- 535; 664 NW2d 685 (2003).  Involuntary manslaughter is a "catch-all crime . . . characterized in terms of what it is *not*, and ascertaining whether a homicide is involuntary manslaughter requires essentially questioning first whether it is murder, voluntary manslaughter, or a justified or excused homicide.  If it is none of those, then the homicide, generally, is involuntary manslaughter." *People v Holtschlag*, 471 Mich 1, 7; 684 NW2d 730 (2004).  The requisite mens rea for involuntary manslaughter is gross negligence.  *Id*. at 16-17.  To support a conviction of first-degree child abuse, the prosecution must show that the defendant "knowingly or intentionally cause[d] serious physical harm or serious mental harm to a child." MCL 750.136b(2).  The defendant must have intended to cause serious mental or physical harm to the child, or had to know that serious mental or physical harm would be caused by his actions. *People v Maynor*, 470 Mich 289, 295-296; 683 NW2d 565

- 28 -

(2004).  Identity is an element of both involuntary manslaughter and first-degree child abuse, because "identity is an element of every offense."  *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008).

The prosecution presented sufficient evidence that defendant was the cause of [M.H.]'s injuries and death.  Dr. Schmidt testified that he could not pinpoint the precise time when [M.H.] sustained her injuries, but indicated that, based on the available evidence, they were most likely sustained "within twelve to maybe twenty-four hours of when the impact occurred."  Dr. Dragovic, defendant's expert witness, testified that Mariah's injuries could have been sustained "from several hours . . . up to thirty-six to forty-eight hours" before the time of death.  Defendant argues that, because, according to Dr. Dragovic, there is a possibility that the injuries occurred before [M.H.] was in defendant's care, the prosecution presented insufficient evidence that defendant caused [M.H.]'s death.  Defendant's argument, in essence, asks this Court to disregard Dr. Schmidt's testimony in favor of Dr. Dragovic's.  In other words, defendant asks this Court to evaluate the credibility of witnesses on appeal.  However, the credibility of witnesses is within the purview of the fact finder, and will not be "resolve[d] anew" on appeal.  *People v Davis*, 241 Mich App 697, 700; 617 NW2d 381 (2000), citing *People v Daniels*, 172 Mich App 374, 378; 431 NW2d 846 (1988).  That the jury chose to accept Dr. Schmidt's testimony and reject Dr. Dragovic's is not, without more, a basis for reversal.

However, even without the conflicting medical testimony, the prosecution presented sufficient evidence that defendant's actions caused [M.H.]'s injuries and death.  Defendant does not dispute that [Rhonda] Harbin placed [M.H.] in his care, and by defendant's own admission, only he and his son were in the apartment the entire night, but defendant's son was asleep.  Defendant admitted to shaking [M.H.].  Defendant demonstrated to Sergeant Mackie how he gripped [M.H.] when shaking her: he placed his hands around her rib cage and shook her, by his own account, for at least two or three minutes, possibly more.  The next morning, the paramedics found [M.H.] dead.  Dr. Schmidt testified that [M.H.] suffered injuries to her chest, where defendant gripped her while shaking her. Specifically, Dr. Schmidt testified that [M.H.] suffered a bruised lung, a fractured rib, and hemorrhaging around her fractured rib.  Regarding the injuries [M.H.] sustained to her head, Dr. Schmidt testified that [M.H.] suffered brain swelling, hemorrhaging to her optic nerves, and hemorrhaging to her skull.  Dr. Schmidt testified that these injuries could have been caused if [M.H.] had been

> flung against a surface that is not hard.  For example, a pillow . . . as the infant's head strikes a surface such as a pillow that surface molds itself around the infant's head and distributes the impact throughout the surface area of the infant's head so that there is no discreet evidence of impact.

Defendant told his fellow inmate, Morris, that after he shook [M.H.] he "slammed" her into the bed.  Accordingly, viewing the facts in the light most favorable to the prosecution, a reasonable jury could conclude that defendant's actions in shaking [M.H.] and slamming her into the bed when [M.H.] was in his care, were the cause of [M.H.] death.

Defendant also argues that the failure of Dr. Schmidt's office to include in the autopsy report the results of tissue samples from the organs in [M.H.]'s chest "constituted a violation of the Medical Examiner's Act as all findings from all procedures conducted must be included in the written autopsy report."  MCL 52.205(3) provides, in relevant part, that "the county medical examiner . . . shall carefully reduce or cause to be reduced to writing each fact and circumstance tending to show the condition of the body and the cause and manner of death."  Here, the tissue samples of the organs in [M.H.]'s chest were not reduced to writing.  However, Dr. Dragovic testified that the "injur[y] that [was] essential and critical in this case [was] the head trauma" and noted that no tissue samples were taken from that region.  Therefore, because the slides of tissue samples taken from [M.H.]'s chest were not related to the essential injury that tends to show the cause and manner of death, that they were not documented in the autopsy report is irrelevant; the autopsy did not violate the law.

However, whether MCL 52.205 was violated in this case is immaterial to the jury's determination regarding defendant's guilt.  As explained, there was sufficient evidence presented regarding defendant's identity and causation for a reasonable jury to determine that defendant committed involuntary manslaughter and first-degree child abuse.

(6/26/12 MCOA Op. 5-6, ECF No. 11-25, PageID.1559-1560.)  The gist of Petitioner's habeas claim is that there was insufficient evidence to prove his guilt because Dr. Schmidt did not perform the autopsy and, under Dr. Dragovic's testimony, the injuries could have been inflicted outside the time he was caring for M.H. (Br. 16-17, ECF No. 2, PageID.106-107.)  Petitioner's arguments regarding Dr. Schmidt are not persuasive.  The parties stipulated at trial that Dr. Schmidt was qualified to testify as an expert in forensic pathology and Dr. Schmidt stated he had an opportunity to review the report as well as its findings and did not disagree with it.  (Trial Tr. III 7-12, ECF No. 11-20, PageID.1111-1116.)  Moreover, the alleged flaw in Dr. Schmidt's testimony–that he did not

- 30 -

personally perform the autopsy is just as true as regards the testimony of Dr. Dragovic, which Petitioner asks this Court to re-weigh above the testimony of Dr. Schmidt's.  To do so would be beyond the scope of federal habeas review.  Section 2254(d) "gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them." *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983).

In sum, the state appellate court's decision was neither contrary to, nor an unreasonable application of, clearly established Federal law as determined by the Supreme Court, nor was the decision based on an unreasonable determination of the facts in light of the evidence presented.  28 U.S.C. § 2254(d).  Accordingly, Petitioner is not entitled to relief on this claim.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.  I further recommend that a certificate of appealability be denied.  See *Slack v. McDaniel*, 529 U.S. 473 (2000).


Dated:  March 27, 2017                  /s/ Ray Kent
                                        RAY KENT
                                        United States Magistrate Judge


### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).